# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 10, 2019        Decided May 25, 2021

No. 19-7009

DISTRICT NO. 1, PACIFIC COAST DISTRICT, MARINE
ENGINEERS' BENEFICIAL ASSOCIATION, AFL-CIO,
APPELLANT

v.

LIBERTY MARITIME CORPORATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01618)

———

*Mark J. Murphy* argued the cause for appellant. With him
on the briefs was *Matthew D. Watts*.

*Andrew C. Nichols* argued the cause for appellee. With
him on the brief were *William G. Miossi* and *Paul N. Harold*.
*Steffen N. Johnson* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, and ROGERS and
PILLARD, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* SRINIVASAN.

2

SRINIVASAN, *Chief Judge*: This case stems from a number of labor disputes between Liberty Maritime Corporation and a maritime labor union that represents certain Liberty employees. The parties' collective bargaining agreement provides for resolution of disputes under oversight of an arbitrator appointed by mutual agreement. The union contends that Liberty violated the agreement by unilaterally selecting an arbitrator. Liberty maintains that the arbitrator was validly appointed.

The central issue we confront is who decides whether the arbitrator was validly (i.e., mutually rather than unilaterally) appointed: the challenged arbitrator himself, or instead a court? The district court concluded that the collective bargaining agreement assigns to the arbitrator himself the authority to determine the validity of his own appointment. We disagree and understand the agreement to leave that issue for resolution by a court. We thus vacate the district court's judgment and remand for the court to determine whether the challenged arbitrator was validly appointed.

I.

A.

District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO, whom we will refer to as MEBA, is a union that has long represented deck and marine engineering officers employed by Liberty Maritime Corporation. MEBA and Liberty are parties to a decades-old collective bargaining agreement.

Section 2 of the agreement, entitled "Grievance Procedure and Arbitration," states that "[a]ll disputes relating to the interpretation or performance of this Agreement shall be

determined in accordance with the provisions in this Section." Agreement of District No. 1, Pacific Coast District, MEBA (AFL-CIO) and Liberty Maritime Corporation ("Agreement") § 2(a), J.A. 45–46. Those provisions call for establishment of a Licensed Personnel Board charged with "resolv[ing] any grievance" either party may have. Agreement § 2(b), J.A. 46. The Board is comprised of four representatives: two chosen by MEBA and two chosen by Liberty.

An arbitrator serves as the chair of the Board and presides over its meetings. If the Board resolves a matter by majority vote, that decision becomes final. But in the event the Board cannot reach a majority resolution, the arbitrator serves as the tiebreaker. A decision by the arbitrator is final and binding on both parties. Agreement §§ 2(b)–(c), J.A. 46–47.

The agreement specifies that the "Arbitrator will be appointed by mutual agreement." Agreement § 2(d), J.A. 47. The agreed-upon arbitrator serves "for a one (1) year period, renewable for one (1) year periods by mutual consent." *Id.* In the event of the arbitrator's termination during the one-year term, "the parties will agree within fifteen (15) days upon a successor." *Id.* If the parties cannot agree on a successor, "the parties shall request an agreed upon agency to designate five (5) names from among which each party shall have the right to strike two (2), and the Agency shall designate a successor who shall serve for the balance of the contract year." *Id.* The term "agreed upon agency," according to a supplemental memorandum of understanding between the parties, is "intended to mean either the United States Secretary of Labor or the American Arbitration Association." J.A. 150.

4

B.

Despite the existence of the procedures for resolution of grievances set forth in Section 2 of the collective bargaining agreement, the parties long refrained from invoking those procedures when a grievance arose. Instead, when either party raised a grievance, the parties would request a list of qualified arbitrators from the American Arbitration Association (AAA). The parties would then take turns striking names from the list and choose the last remaining person as the arbitrator.

In April 2018, however, Liberty informed MEBA of its interest in invoking the Section 2 procedures to resolve a number of outstanding grievances. MEBA responded that it did "not believe there is any reason to resurrect the licensed personnel board procedures," noting that the parties had "never followed these procedures." J.A. 314. MEBA instead proposed to select an arbitrator "from a panel of arbitrators issued by AAA." *Id.*

On June 12, 2018, Liberty advised MEBA that it was invoking the Section 2 procedures and identified the two Liberty representatives it was appointing to the Licensed Personnel Board. Liberty also called a meeting of the Board to take place on June 18, at which, Liberty stated, the first order of business would be to choose the arbitrator. MEBA again objected to Liberty's invocation of the Section 2 procedures. The parties exchanged a flurry of emails over the course of a week, culminating in MEBA's providing the names of its two Board representatives.

Although MEBA ultimately agreed to participate in the Section 2 process, it objected to a revised meeting date (June 26) chosen by Liberty because MEBA's attorney would be

unable to attend. Liberty declined to select another date because, in its view, the parties' attorneys need not join the meeting. MEBA's Board representatives, though, refused to attend the meeting without the participation of counsel. Undeterred, Liberty's two Board representatives met on June 26 and proceeded to appoint an arbitrator.

MEBA then brought this action in the district court. MEBA challenged the arbitrator's appointment on the ground that he had been unilaterally rather than mutually appointed. MEBA's complaint seeks both declaratory and injunctive relief: a declaration stating that Liberty could not unilaterally appoint an arbitrator consistent with Section 2 of the collective bargaining agreement, and an injunction barring Liberty from participating in arbitration proceedings overseen by the challenged arbitrator. Liberty filed a motion to dismiss MEBA's complaint, arguing that the arbitrator had been validly appointed.

The district court treated Liberty's motion to dismiss as a motion to compel arbitration, reasoning that both parties plainly intended to arbitrate their underlying disputes. *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Liberty Mar. Corp.*, No. 18-1618, 2019 WL 224291, at *3 (D.D.C. Jan. 15, 2019). The court then addressed whether the parties' dispute over the validity of the arbitrator's appointment should be resolved by the challenged arbitrator himself or instead by the court. The court read the collective bargaining agreement to assign that issue for resolution by the arbitrator. The court thus granted Liberty's motion to dismiss and referred the parties to arbitration. *Id.* at *5–6. MEBA now appeals.

6

II.

While Liberty does not contest our jurisdiction over MEBA's appeal, we must assure ourselves of our appellate jurisdiction. We generally possess jurisdiction over appeals from final decisions of the district court. 28 U.S.C. § 1291. Here, the district court purported to dismiss MEBA's complaint "without prejudice." *Liberty Mar. Corp.*, 2019 WL 224291, at *6. The district court's "without prejudice" dismissal raises the question of whether the court's order was final and appealable. We conclude that it was.

In *Ciralsky v. CIA*, 355 F.3d 661, 666 (D.C. Cir. 2004), we explained that there is a distinction between a district court's dismissal of a *complaint* without prejudice and a district court's dismissal of an *action* without prejudice. When a court dismisses a complaint without prejudice, the plaintiff generally can "amend his pleading and continue the litigation." *Id.* (internal quotation marks omitted). But the "dismissal of an action—whether with or without prejudice—is final and appealable." *Id.* That is because, when a district court dismisses an action, it terminates the case. *Id.* at 667. Even if the dismissal of the action is denominated "without prejudice," such that claim preclusion principles would not bar the filing of a new action, "that does not change the fact that, in the absence of such an affirmative act" of initiating a new action, the initial "case is at an end." *Id.*

As we recognized in *Ciralsky*, though, "it is not always clear whether a district court intended its order to dismiss the action or merely the complaint." *Id.* To answer that question, the court in *Ciralsky* examined three sources: (i) the language used by the district court in effecting its dismissal, (ii) the language of the dismissal motion granted by the court, and (iii) the course of the litigation. *See id.* at 667–68.

Here, while the district concluded its opinion by stating that it was dismissing the "complaint," the context makes evident that the court in fact sought to dismiss the action in the sense of bringing the case to an end. The same was true in *Ciralsky*: there, too, the district court "spoke several times of dismissing the complaint," but the circumstances indicated that the court believed it was dismissing the action, i.e., ending the case. *Id.* at 667. The three sources we examined in *Ciralsky* in reaching that conclusion all likewise point to a dismissal of the action here.

*First*, the district court concluded its memorandum opinion granting Liberty's dismissal motion by stating that, "because there are no issues left for this court to resolve, I easily conclude that it is appropriate to dismiss this case in its entirety." *Liberty Mar. Corp.*, 2019 WL 224291, at *6 (internal quotation marks omitted). That language bespeaks a final dismissal of an action—i.e., an end of the case—not merely a dismissal of the complaint. There is little doubt "that the district court thought the order had terminated the action." *Ciralsky*, 355 F.3d at 667. After all, the court said that "there are no issues left . . . to resolve" and that it was "appropriate to dismiss this case in its entirety." *Liberty Mar. Corp.*, 2019 WL 224291, at *6 (internal quotation marks omitted).

*Second*, although Liberty's motion referenced dismissal of the complaint, the motion in substance sought dismissal of the action. Liberty's chief argument was that the collective bargaining agreement gives the arbitrator, not a court, the authority to determine the validity of his own appointment. As a result, Liberty contended, "'all of the claims are subject to resolution by the arbitrator,' and the Court should dismiss them." Defendant's Mot. to Dismiss at 2, J.A. 439 (citing *W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp.

3d 158, 174 (D.D.C. 2014)).  Liberty noted parenthetically that, in the cited decision, *W & T Travel Servs.*, the court had "dismisss[ed] a suit," i.e., an action.  *Id.*  And Liberty's submission that MEBA's claims should be resolved in arbitration proceedings, not in the court, necessarily contemplated bringing the action before the court to an end. Liberty correspondingly sought a dismissal "with prejudice." *Id.* at 14, J.A. 451.

*Third*, the course of the litigation confirms that, in granting Liberty's dismissal motion, the district court effected a dismissal of the action, not just the complaint.  When the court granted Liberty's motion, the court in both its opinion and its order expressly stated that "the parties are referred to arbitration." *Liberty Mar. Corp.*, 2019 WL 224291, at *6.  That resolution terminated the litigation before the court, shifting the proceedings to an arbitral forum.  *Cf. Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 82 (2000) (order compelling arbitration is a final, appealable decision for purposes of the Federal Arbitration Act).

For those reasons, we hold that the district court's grant of dismissal amounted to a final decision as to the action, not just the complaint.  We thus possess appellate jurisdiction to consider MEBA's appeal.

## III.

The underlying question in MEBA's action is whether the arbitrator selected by Liberty's designated Board members was "appointed by mutual agreement" in accordance with the terms of the parties' collective bargaining agreement.  The issue we face on appeal is who decides that underlying question:  does the challenged arbitrator himself decide whether he was validly

appointed by mutual agreement, or is that instead a decision for a court?

The parties agree that the issue of who decides is governed by the parties' intent as manifested in their collective bargaining agreement. Liberty contends, and the district court agreed, that the agreement calls for the arbitrator himself to resolve whether he had been appointed by mutual agreement. MEBA argues that the parties left that decision to a court. We agree with MEBA.

As an initial matter, MEBA contends that the district court erred by treating Liberty's motion to dismiss as a motion to compel arbitration. That treatment, in MEBA's view, resulted in the district court's applying an unduly lenient standard when granting Liberty's motion. We have no need to resolve that issue: even assuming the district court permissibly converted the motion to dismiss into a motion to compel arbitration, we conclude that the court should not have compelled arbitration. Rather, the question whether the arbitrator was validly appointed by mutual agreement should be answered by a court, not by the contested arbitrator himself.

A motion to compel arbitration is decided on a summary judgment standard. *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008); Fed. R. Civ. P. 56(c). The issue is "whether or not there had been a meeting of the minds on the agreement to arbitrate" the dispute at hand. *Aliron Int'l*, 531 F.3d at 865 (internal quotation marks omitted). There was no such meeting of the minds here to empower the challenged arbitrator himself to decide whether he was validly appointed by mutual agreement.

Our analysis proceeds in two steps. First, we assess whether the dispute over the arbitrator's appointment involves

the kind of question that is presumptively for judicial rather than arbitral resolution. We answer that question yes. Second, we assess whether the parties' collective bargaining agreement overcomes that presumption through a clear and unmistakable assignment of power to the challenged arbitrator himself to decide the validity of his own appointment. We find no clear and unmistakable provision to that effect in the agreement, meaning that the matter has been left for resolution by a court.

A.

The Supreme Court has explained that "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). The parties to an arbitration agreement "may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* (internal quotation marks omitted). The gateway issue in this case is whether the arbitrator was validly appointed by mutual agreement.

We note at the outset that, in assessing whether that gateway issue is for a court or instead for the contested arbitrator himself to resolve, we assume that the issue is one that parties *could* "agree to have an arbitrator decide" if they so intend. *Id.* That may not always be the case. The Supreme Court has observed, for instance, that "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.* at 530; *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010). Insofar as the threshold question "whether a valid arbitration agreement exists" then is necessarily for "the court [to] determine[]," *Henry Schein*, 139

S. Ct. at 530—such that it cannot be delegated to an arbitrator—MEBA makes no argument that the gateway issue in this case is of that type. We thus assume that parties could enable a contested arbitrator herself to decide whether she was validly appointed by mutual agreement, and we proceed to assess whether the parties did so here.

1.

The Supreme "Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). That is, the "question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (formatting modified) (internal quotation marks omitted). A "question of arbitrability" then is presumptively for a court to decide, unless the parties clearly and unmistakably assign it to the arbitrator.

The Supreme Court has explained, though, that the "clearly and unmistakably" standard does not govern every gateway issue that could be characterized as a "question of arbitrability." "Linguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits." *Id.* But some gateway issues, the Court has held, "are presumptively for the arbitrator, not for the judge." *Id.* at 85.

So how do we determine whether a given gateway issue is a "question of arbitrability" such that it is presumptively for a

court to decide (absent a clear and unmistakable provision to the contrary), or instead falls outside that category such that it is presumptively for the arbitrator to decide? The answer, the Supreme Court has instructed, turns on whether the parties would likely have expected a court or instead an arbitrator to decide the issue. *See id.* at 83–85.

In particular, a gateway issue will qualify as a "question of arbitrability"—and thus presumptively decided by a court— "where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.* at 83–84. Examples of such questions of arbitrability include a "dispute about whether the parties are bound by a given arbitration clause" and "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Id.* at 84; *see Henry Schein*, 139 S. Ct. at 529; *First Options*, 514 U.S. at 943.

On the other hand, the Supreme "Court has found the phrase 'question of arbitrability' *not* applicable in other kinds of general circumstances where parties would likely expect that an arbitrator would decide the gateway matter." *Howsam*, 537 U.S. at 84. For instance, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide." *Id.* (internal quotation marks omitted). That includes questions about whether "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met." *Id.* at 85 (internal quotation marks and emphasis omitted). Those sorts of threshold procedural issues fall "within the class of gateway

procedural disputes that do not present what [the Supreme Court's] cases have called 'questions of arbitrability,'" such that "the strong pro-court presumption as to the parties' likely intent does not apply." *Id.* at 85–86.

2.

Where, then, does that leave us with respect to the gateway issue in this case—viz., whether the arbitrator was validly appointed by mutual agreement or instead invalidly selected by unilateral action?  Does that gateway issue qualify as a question of arbitrability, presumptively decided by a court?  Or is it instead the kind of gateway issue that is presumptively decided by an arbitrator—here, the disputed arbitrator himself?  The answer, as explained, turns on whether the issue is one that parties likely would have expected is for a court to decide or instead likely would have expected is for the arbitrator to decide.  We believe the former.

Courts enforce arbitral awards "[b]ecause the parties have contracted to have disputes settled by an arbitrator *chosen by them* rather than by a judge."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37 (1987) (emphasis added).  Arbitration thus essentially presupposes a consensually chosen arbitrator.  In the event of a disagreement between the parties over whether an arbitrator was consensually chosen in accordance with the terms of their contract, it is unlikely that the parties would have expected resolution of the dispute by the disputed arbitrator herself.

Consider the respective positions of parties when there is a dispute about whether an arbitrator has been mutually agreed upon.  One party believes the arbitrator has been validly appointed by joint affirmation.  The other party believes the arbitrator has been impermissibly foisted upon it by the

opposing side acting alone. In that context, why would the parties expect that the disputed arbitrator herself would resolve the legitimacy of her own appointment, as opposed to a neutral third party (a court) deciding the matter? Neither party presumably would want to risk being put in a position in which an arbitrator whom it believes has been unilaterally imposed upon it by the opposing party is nonetheless given power to decide for herself whether she can act as the final arbiter of disputes between them.

Rather, this is the sort of "circumstance where contracting parties would likely have expected a court" to "decide[] the gateway matter, where they are not likely to have thought that they had agreed that [the challenged] arbitrator [herself] would do so." *Howsam*, 537 U.S. at 83. At the least, it is appropriate to *presume* that parties would not intend for the challenged arbitrator herself to decide the validity of her own appointment absent a clear and unmistakable indication that the parties intended to give her that authority.

Imagine what would happen in a situation involving not just one disputed arbitrator but two, with each side asserting that its preferred arbitrator was validly appointed by mutual agreement but that the opposing side's preferred arbitrator was invalidly appointed unilaterally. If the validity of an arbitrator's appointment were deemed an issue for the arbitrator herself to resolve, which of the two disputed arbitrators would decide the matter? If they each deemed themselves validly appointed, how would the stalemate get resolved? The more sensible course, and the one more in keeping with parties' likely expectations, is to presume—absent a clear and unmistakable indication to the contrary—that the gateway question of whether an arbitrator has been validly appointed by mutual agreement is for a court to decide, not for the challenged arbitrator herself.

That conclusion is reinforced by the understanding that courts have presumptive responsibility to decide whether a "particular type of controversy" lies within an arbitrator's authority. *Id.* at 84; *see Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (plurality opinion); *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 651–52 (1986). If courts are given presumed power to decide whether a particular matter falls within an arbitrator's authority because "contracting parties would likely have expected a court to have decided" the question, *Howsam*, 537 U.S. at 83, courts should also be presumed to decide whether the arbitrator who would exercise that authority (potentially over many matters) was validly appointed in the first place.

While the Supreme Court has not specifically addressed that issue, a group of three Justices considered it in *Green Tree Financial Corp. v. Bazzle*, and their resolution accords with ours. The issue in *Bazzle* was whether the parties' arbitration agreement allowed for class arbitration. The lead plaintiffs and the defendant company had agreed on an arbitrator to resolve their dispute, *see* 539 U.S. at 449 (plurality opinion), and the question was whether that agreed-upon arbitrator could also arbitrate the claims of the entire plaintiff class. The Justices making up the majority viewed that issue to concern "*what kind of arbitration proceeding* the parties agreed to." *Id.* at 452; *see id.* at 454–55 (Stevens, J., concurring in the judgment and dissenting in part). That sort of question, the majority held, was for the arbitrator to decide. *See id.* at 452–53 (plurality opinion).

Chief Justice Rehnquist, joined by Justices O'Connor and Kennedy, conceived of the matter differently. In their view, the question whether the arbitrator could arbitrate the entire class's claims concerned not *what* kind of arbitration

proceeding the parties had agreed to, but rather *who* is the arbitrator chosen to resolve each class member's claims. *See id.* at 458–59 (Rehnquist, C.J., dissenting). As those Justices saw it, allowing the single arbitrator chosen by the named plaintiffs and defendant company to resolve the claims of the entire class of plaintiffs would violate the agreement's provision calling for selection of arbitrators by mutual consent. That provision, to those Justices, meant that there needed to be mutual agreement on a specific arbitrator for *each* class member's claims, which they believed had not been accomplished by the initial agreement on a single arbitrator. *See id.* at 459.

Of particular relevance here, in reaching that conclusion, those Justices explained that "the choice of arbitrator is as important a component of the agreement to arbitrate as is the choice of what is to be submitted to him." *Id.* at 456–57. And because a dispute over what has been submitted to the arbitrator was "a question for the courts under" the Supreme Court's precedents, rather than a question for an arbitrator, a dispute over "how the arbitrator should be selected" was also an issue "for the courts." *Id.* at 457. Although those three Justices expressed that view in a dissenting opinion, the majority suggested no disagreement with the proposition that a dispute over "how the arbitrator should be selected" is for a court to resolve. Rather, because the Justices in the majority believed that the case instead concerned what kind of arbitration proceeding the parties had agreed to, they had no occasion to disagree with the notion that questions about the selection of an arbitrator are presumptively for a court.

Liberty, though, expresses a contrary view in this case. According to Liberty, a disagreement about "how the arbitrator should be selected" is ultimately a procedural issue. It should thus presumptively be assigned to the arbitrator for resolution,

Liberty submits, akin to "procedural questions which grow out of the dispute and bear on its final disposition." *Howsam*, 537 U.S. at 84 (internal quotation marks omitted). We are unpersuaded by Liberty's argument.

True, the Supreme Court in *Howsam* explained that gateway procedural issues such as "waiver, delay, or a like defense to arbitrability" are generally for the arbitrator, not a court, to resolve. *Id.* (internal quotation marks omitted). But that is not because of any categorical rule that a gateway issue amenable to characterization as "procedural" necessarily lies with the arbitrator. Rather, it is because threshold procedural issues like waiver, timeliness, notice, and estoppel, are ones as to which "parties would likely expect that an arbitrator would decide the gateway matter." *Id.*

The pivotal question is: what would parties likely expect? And for all the reasons we have explained, when the issue is whether an arbitrator was validly appointed by mutual agreement, parties would likely expect resolution by a court, not by the challenged arbitrator herself. *See Bazzle*, 539 U.S. at 457 (Rehnquist, C.J., dissenting) ("[T]he parties' agreement as to how the arbitrator should be selected is much more akin to the agreement as to what shall be arbitrated, a question for the courts . . . than it is to allegations of waiver, delay, or like defenses to arbitrability, which are questions for the arbitrator under *Howsam*.") (internal quotation marks omitted).

B.

While we thus decide that the gateway issue of whether the arbitrator was appointed by mutual agreement is a "question of arbitrability" within the meaning of the Supreme Court's decisions, that means that the issue is only *presumptively* for a court to resolve. *See Howsam*, 537 U.S. at 83. The

presumption is overcome if parties clearly and unmistakably assign a question of arbitrability to the arbitrator. *See id.* Here, however, there was no clear and unmistakable agreement by the parties to give the challenged arbitrator himself the power to determine the validity of his own appointment.

1.

In arguing that the parties agreed to empower the arbitrator to decide whether his appointment came about by mutual agreement, Liberty principally relies on a reference to the American Arbitration Association in the collective bargaining agreement. That reference appears in the provisions setting out how the parties will select a replacement arbitrator in the event of an arbitrator's termination in the midst of her one-year term: if the parties cannot agree within fifteen days on a successor arbitrator who will serve the remainder of the term, they must "request an agreed upon agency" to "designate a successor" through a prescribed process, Agreement § 2(d), J.A. 47, and the "agreed upon agency" is in turn defined to "mean either the United States Secretary of Labor or the American Arbitration Association," Supp. Mem. (1969), J.A. 150.

Liberty's reliance on that reference to the AAA proceeds in multiple steps. First, Liberty observes, the AAA rules governing labor arbitrations provide that an arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." AAA Labor Arbitration Rule 3(a), https://www.adr.org/sites/default/files/Labor_Arbitration _Rules_3.pdf. Second, Liberty submits, that rule encompasses a disagreement about whether the arbitrator was validly appointed in the first place. Third, Liberty asserts, if parties to an arbitration agreement incorporate AAA arbitration rules, they thereby delegate to an arbitrator the authority to decide

gateway questions of arbitrability such as the scope of the arbitrator's jurisdiction. And fourth, Liberty contends, the parties in this case intended to incorporate the AAA rules when they mentioned the AAA in the agreement. The upshot, according to Liberty, is an agreement by the parties to give the challenged arbitrator himself the power to decide whether he was validly appointed.

We see no such agreement from the mere reference to the AAA, much less a clear and unmistakable agreement of the kind that would be necessary to overcome the presumptive assignment of the gateway arbitrability question in this case to a court. First, while we have no need to resolve the matter here, it is far from clear that an arbitrator's ostensible power under AAA Labor Arbitration Rule 3(a) to decide "her own jurisdiction" on matters such as "the existence, scope, or validity of the arbitration agreement," extends to deciding whether she was validly appointed in the first place. Assigning an arbitrator authority to decide the scope of the arbitration agreement, for instance, would seem to presuppose agreement on the arbitrator who would make that decision. And even if the parties attempt to give an agreed-upon arbitrator the power to decide the scope of their arbitration contract, that conferral of authority would not necessarily carry with it the power to decide whether she is their agreed-upon arbitrator to begin with. Nonetheless, we will assume arguendo that the second step of Liberty's argument is correct.

With regard to the third step of Liberty's reasoning, virtually every court of appeals to address the issue agrees that when parties expressly incorporate the AAA rules, they thereby clearly and unmistakably delegate to an arbitrator the power to decide gateway questions of arbitrability (including questions about the arbitrator's own "jurisdiction"). *See Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)

(cataloging cases). While our court has not specifically addressed the issue in the context of the AAA rules, we have reached the same conclusion when parties incorporate the rules of the United Nations Commission on International Trade Law, which contain a parallel provision assigning to an arbitrator the authority to rule on her own jurisdiction. *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 207–08 (D.C. Cir. 2015).

We note, though, that the Supreme Court has "express[ed] no view" on whether parties' explicit incorporation of AAA rules establishes a clear and unmistakable delegation of threshold arbitrability questions to the arbitrator. *Henry Schein*, 139 S. Ct. at 531; *see id.* at 528. There were several references to that issue when the Court recently heard oral argument after granting review a second time in the *Henry Schein* case, but the Court has dismissed the writ of certiorari as improvidently granted, without issuing an opinion. *See* Transcript of Oral Argument at 9–10, 18–19, 31–33, 40–41, 63–66, *Henry Schein, Inc v. Archer & White Sales, Inc.*, 141 S. Ct. 656 (2021) (No. 19-963). For our purposes, then, we will assume the soundness of the third step of Liberty's reasoning, as we did with the second step.

Liberty's argument nonetheless falls short at its fourth and final step. The parties' mention of the AAA in their agreement does not embody an incorporation of the AAA rules, let alone a clear and unmistakable incorporation. For starters, the parties initially added the reference to the AAA in 1969, long before the relevant AAA rule giving the arbitrator power to decide her own jurisdiction even came into being: MEBA notes that the rule first appeared in the AAA rules for labor disputes in 2013, and Liberty does not dispute the point. *See* MEBA Br. 26; *see also* American Arbitration Association, Handbook on Commercial Arbitration 83 & n.84 (2d ed. 2010) (explaining

that the AAA first introduced the relevant language to any of its rules in the late 1990s).

At any rate, even assuming the AAA rule concerning an arbitrator's power to decide her own jurisdiction was in effect at the relevant time, the reference to the AAA in the parties' agreement simply does not mention (much less incorporate) the AAA rules. Compare, for instance, the agreement in *Henry Schein*. There, the parties agreed that disputes arising under the agreement would be resolved "by binding arbitration in accordance with the arbitration rules of the American Arbitration Association." 139 S. Ct. at 528 (internal quotation marks omitted). Here, by contrast, the agreement contains its own rules for the conduct of proceedings to resolve grievances. Agreement § 2, J.A. 45–52. The agreement's reference to the AAA instead concerns the selection of an arbitrator, and only as a third-tier fallback matter: the AAA becomes salient only if (i) the agreed-upon arbitrator were to be terminated in the midst of her one-year term, (ii) the parties cannot agree on a successor, and (iii) the parties opt to consult the AAA rather than the Secretary of Labor for help in choosing a successor arbitrator to serve for the balance of the year. And even if all of those contingencies were to come to pass, the agreement does not expressly (or necessarily) call for applying the AAA rules for any disputes that may arise during that brief period.

In this case, it bears recalling, the AAA had no evident involvement in the selection of the challenged arbitrator. He was chosen by Liberty's designated members of the Licensed Personnel Board (without the input of MEBA's designated Board members), raising the question whether he was validly appointed by mutual agreement. It is true that the AAA could in theory play a role under the agreement in appointing an arbitrator in circumstances far removed from this case. But the possibility of the AAA's involvement in selecting an arbitrator

in one highly contingent situation addressed by the agreement was not a clear and unmistakable incorporation in all situations of the AAA rule giving an arbitrator power to decide questions about her jurisdiction.

2.

While Liberty principally relies on the agreement's reference to the AAA in arguing that the parties agreed to delegate gateway arbitrability questions to the arbitrator, Liberty also notes the breadth of matters falling within the grievance procedures' coverage. The coverage provision states: "All disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with the provisions in this Section," i.e., the grievance and arbitration procedures. Agreement § 2(a), J.A. 46. We have previously described that provision as "quite broad" in scope. *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 815 F.3d 834, 846 (D.C. Cir. 2016).

While the agreement may describe the coverage of the grievance procedures in "quite broad" terms, that description did not clearly and unmistakably give the challenged arbitrator himself the power to decide the validity of his own appointment. The coverage language pertains centrally to disputes about the myriad substantive provisions in the agreement: matters such as wages, hours of labor, working conditions, safety equipment, discharges of workers, vacations, holidays, severance, and the like. Agreement i–ii, J.A. 31–32. Insofar as the coverage language could be seen to speak to disputes about the grievance procedures themselves, that language does not rise to the level of a clear and unmistakable delegation of gateway questions of arbitrability to an arbitrator.

For example, in *AT&T Technologies, Inc., v. Communications Workers of America*, 475 U.S. 643, 649 (1986), the Supreme Court invoked the general rule that "the question of arbitrability" is ordinarily "for judicial determination," "[u]nless the parties clearly and unmistakably provide otherwise." The parties' collective bargaining agreement in that case provided for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder," "provided that such dispute is not excluded from arbitration by other provisions of this contract." *Id.* at 645 n.1 (internal quotation marks omitted). The Court described that arbitration provision as "broad" in reach. *Id.* at 650. But the Court nonetheless held that a gateway question about whether a particular dispute was subject to arbitration (or instead excluded from arbitration) "was for the court, not the arbitrator, to decide," and thus "should not have been referred to the arbitrator." *Id.* at 651–52. The same is true in this case of the dispute over whether the challenged arbitrator was validly appointed by mutual agreement.

## C.

Because the dispute over whether the arbitrator was appointed by mutual agreement poses a question of arbitrability for resolution by a court, we will remand this case for the district court to conduct that inquiry in the first instance. Before doing so, however, we address a threshold disagreement between the parties about the meaning of the mutual-agreement requirement. In Liberty's view, that requirement calls for the four party-appointed members of the Licensed Personnel Board to agree on the arbitrator. In MEBA's view, the parties themselves—not the Board members—must mutually agree on the arbitrator. We believe MEBA's understanding is correct.

The relevant language of the collective bargaining agreement states that the "Arbitrator will be appointed by mutual agreement for a one (1) year period, renewable for one (1) year periods by mutual consent."  Agreement § 2(d), J.A. 47.  Read in isolation, the reference to "mutual agreement" does not necessarily point to the Board members or the parties. But consider the immediately ensuing sentence, discussed previously, which states: "In the event of the termination of the Arbitrator, *the parties will agree* within fifteen (15) days upon a successor, failing which, *the parties shall request* an agreed upon agency to designate five (5) names from among which each party shall have the right to strike two (2), and the Agency shall designate a successor who shall serve for the balance of the contract year."  *Id.* (emphases added).  That sentence expressly calls for "the parties," not the Board members, to agree on a successor to replace a terminated arbitrator.  In that light, the previous sentence is best read likewise to call for mutual agreement of the parties, not the Board members.

A contrary reading would lead to an anomalous result:  the Board members would bear responsibility for appointing the arbitrator, but in the event of that arbitrator's termination, the parties themselves—for the first time—would need to agree on a successor to complete the balance of the term.  The more sensible reading would give the parties themselves responsibility for appointing the arbitrator throughout— whether the initial choice or any ensuing choice of a successor.

Other provisions of the agreement fortify that reading. Section 2(e), for example, states, "The Arbitrator must render a decision within fifteen (15) days after the hearing has been closed unless the parties have otherwise extended such time by mutual consent."  J.A. 48.  That provision plainly speaks in terms of mutual consent of the parties.  And Section 2(d) uses

the identical language of "mutual consent" to describe who can renew the arbitrator's appointment for successive terms.

To be sure, one provision of the agreement refers to a decision to be made by mutual agreement of the Board members: Section 2(b) states, "If said Board resolves any grievance either by majority vote or by mutual agreement, said grievance shall be deemed settled." J.A. 46. But the language of that sentence expressly points to a mutual agreement of the Board members. Section 2(d)'s requirement that "[t]he Arbitrator will be appointed by mutual agreement," by contrast, does not expressly speak in terms of either the Board members or the parties themselves. But the immediately ensuing sentence, as explained, resolves any ambiguity, making clear that the provisions governing the selection of the arbitrator contemplate a mutual agreement by the parties.

With respect to whether the parties here mutually agreed to the appointment of the challenged arbitrator, we remand to the district court to decide the issue. MEBA contends that the arbitrator was not selected by mutual agreement of the parties. And while Liberty has argued thus far that the Board members should be deemed to have mutually agreed on the arbitrator, Liberty is free to contend on remand that Section 2(d)'s requirement of an agreement by the parties themselves was satisfied.

## D.

Before concluding, we note that a recent decision of a New York state court in a case involving the same parties is no obstacle to our deciding this appeal. *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Liberty Mar. Corp.*, No. 655407/2018 (N.Y. Sup. Ct. 2021). MEBA initiated that separate litigation after it filed this lawsuit. In the state court

proceedings, MEBA sought to vacate arbitration awards issued by the challenged arbitrator. Here, by contrast, MEBA seeks to enjoin those arbitration proceedings, but it does not request vacatur of particular arbitration awards.

The collective bargaining agreement contemplates precisely that type of bifurcated litigation. Section 2(o) of the agreement begins, "Any action to enjoin a grievance or arbitration proceeding under this Agreement shall be instituted in the federal courts of the District of Columbia." J.A. 51. But the provision then goes on to say, "Any action to modify or vacate an arbitration award shall be instituted in the courts of the State of New York." *Id.* Consistent with the agreement, MEBA sought to enjoin an arbitration proceeding in the federal courts of the District of Columbia before instituting an action to vacate arbitration awards in the state courts of New York. And while Liberty alerted us to the state court decision, Liberty has not argued that we should not decide this appeal.

\* \* \* \* \*

For the foregoing reasons, we vacate the district court's order compelling arbitration and remand for the district court to determine whether the arbitrator was appointed by mutual agreement of the parties.

*So ordered.*